UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CHARLES B. JOHNSON,                            :
as Trustee of the Johnson Family Trust, and
TEMPLETON GLOBAL INCOME FUND,                  :

                 Plaintiffs,         :        Civil Action No. _____

   v.
                           :
SABA CAPITAL MANAGEMENT, L.P.,                         **VERIFIED COMPLAINT**
SABA CAPITAL MANAGEMENT GP, LLC,  :
SABA CAPITAL MASTER FUND, LTD.,                        **DEMAND FOR JURY TRIAL**
BOAZ R. WEINSTEIN, KAREN                        :
CALDWELL, KETU DESAI, MARK
HAMMITT, and ANATOLY NAKUM,                    :

                 Defendants,          :
   and
                           :
FIRST COAST RESULTS, INC.,
                           :
             Nominal Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

        Plaintiffs Charles B. Johnson, as Trustee of the Johnson Family Trust, and the

Templeton Global Income Fund ("GIM" or the "Fund"), by and through their undersigned

counsel, allege against defendants Saba Capital Management, L.P., Saba Capital Management

GP, LLC, Saba Capital Master Fund, Ltd., (each a "Saba Entity"), Boaz R. Weinstein (together

with the Saba Entities, "Saba" or "the Saba Defendants"), Karen Caldwell, Ketu Desai, Mark

Hammitt, and Anatoly Nakum (each a "Saba Nominee" and together, the "Saba Nominee

Defendants") and nominal defendant First Coast Results, Inc. ("First Coast," and together with

the Saba Defendants and the Saba Nominee Defendants, the "Defendants") as follows:

        1.     Plaintiffs Charles B. Johnson, as Trustee of the Johnson Family Trust,f

and GIM bring this action to protect GIM's shareholders from the Saba Defendants' and Saba

Nominee Defendants' false and misleading proxy solicitation conducted in violation of Section

14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n, and Rule 14a-9 promulgated by the Securities and Exchange Commission ("SEC") under the Exchange Act, 17 C.F.R. § 240.14a-9. Section 14(a) and Rule 14a-9 prohibit material misrepresentations and omissions in proxy statements sent to shareholders of registered securities. Defendants' materially false and misleading proxy solicitation has caused substantial injury to GIM's shareholders, which will become irreparable unless the Court enjoins final certification of the preliminary results of GIM's June 6, 2022 shareholder vote to elect four trustees to GIM's Board of Trustees (the "Board").

2.      The Saba Defendants (a hedge fund and its managers) commenced a proxy solicitation in an attempt to take over GIM for their own benefit and profit to the detriment of other shareholders' interests. To that end, over the weekend prior to the June 6, 2022 shareholder vote, the Saba Defendants struck—but kept secret—a deal to pay at least one shareholder a significant premium to the market price of the Fund's shares, with an additional premium if Saba's candidates prevailed in the trustee election. The federal securities laws expressly require that any such arrangements, even if legally done, be fully disclosed with sufficient time to be absorbed by those shareholders whose votes will be impacted. Saba failed to make those required disclosures, keeping its deal secret until after the vote had concluded.

3.      In particular, as of Friday, June 3, 2022, it became clear to Saba and GIM that Saba's slate of nominees appeared poised to lose the GIM shareholder vote. During the course of the weekend leading up to that vote, Saba's Chief Investment Officer Boaz Weinstein reached out to at least one significant GIM shareholder, who had already submitted its votes in favor of the GIM nominees, to propose a deal. Mr. Weinstein offered to pay that shareholder a premium price for the shareholder's shares, with the deal being particularly rich if Saba's slate of

nominees were to win the election.  The secret deal that Saba made with that shareholder, with its obvious significant incentives for that shareholder to switch its votes and support Saba's nominees—along with any other secret deals struck by Saba—delivered the election to Saba.

4.       Control of the Fund hangs in the balance:  if Saba's slate of nominees is seated, Saba employees and its other hand-selected nominees will occupy eight of the eleven seats on GIM's Board.  Despite the significance of the vote—and that it could hand control of the Fund to Saba—Saba, in violation of the federal securities laws, deliberately chose not to disclose the existence or the terms of its secret deal until after the annual shareholder meeting had concluded and the votes were cast.  If not addressed by this Court, Saba's unlawfully undisclosed deal puts GIM and its ordinary shareholders—many of whom are individual retail investors who invested in GIM to obtain a long-term, steady income—in the hands of a hedge fund manager that is well-known to force dramatic and potentially harmful liquidity events, or to reshape the Fund's investments into riskier and speculative strategies.

5.       Saba's failure to disclose its clandestine deal is particularly wrongful because any such agreement was required to be disclosed by applicable SEC rules, and pursuant to those rules, Saba had previously assured shareholders that no such agreements existed. Further, Saba had ample opportunity to disclose its secret deal ahead of the June 6, 2022 shareholder vote by, for example, filing corrective proxy material.  In fact, although three Saba representatives attended the annual shareholder meeting in person—including Saba's Chief Compliance Officer/General Counsel—none of them disclosed Saba's secret deal or sought to adjourn the meeting to allow Saba time to make appropriate disclosures.  Without this covert deal, the Saba Nominee Defendants would have lost the election.

6.      Shareholder harm from Saba's illegal conduct is unquestionably imminent. Saba has demanded that the inspector of the election of the shareholder meeting certify the voting results *immediately* over the weekend, despite a pending review and challenge of the vote tabulation.  And Saba is also attempting to call an immediate special meeting of the Board in order to seat its nominees and, despite open- and closed-end funds being among the most highly regulated financial products in existence, abruptly fire the Fund's longstanding regulatory counsel (as well as longstanding counsel to the independent trustees) and presumably replace them with Saba's counsel with no apparent transition plan—all *before* the results of the shareholder vote are even certified.  There is simply no legitimate business reason why these actions—which would cause irreparable harm to GIM's shareholders—must be taken on such an expedited timetable.

## NATURE OF THE ACTION

7.      On April 13, 2022, GIM disseminated a proxy statement to its shareholders (the "GIM Proxy Statement," attached hereto as Exhibit A), informing them that GIM's annual shareholder meeting would take place on June 6, 2022, and encouraging its shareholders to re-elect a slate of four well-qualified GIM trustees to serve on the Board.

8.      On the following day, the Saba Defendants—some of whom are GIM's largest shareholders—and the Saba Nominee Defendants disseminated a competing proxy statement to the shareholders of GIM (the "Saba Proxy Statement," attached hereto as Exhibit B) encouraging GIM shareholders to, among other things, vote for Saba's rival slate of trustees, and asking shareholders to support Saba's proposal to terminate GIM's long-time investment manager, Franklin Advisers, Inc. ("Franklin").

9.      The Saba Defendants are a hedge fund and its managers who invest in closed-end funds like GIM and engage in tactics that are contrary to the interests of other

4

shareholders in the funds they target.  Saba has historically utilized an "arbitrage" strategy to force "liquidity events," such as the complete liquidation of the fund or the conversion or merger of the closed-end fund into an open-end fund.  Saba also has recently taken over another closed-end fund and installed itself as the fund's manager, changing that fund into an unrecognizable and risky investment and keeping the management fees for itself.[1]  Saba's aim to liquidate a fund or convert it into a speculative vehicle under its own management, is fundamentally at odds with the retail shareholders who typically invest in closed-end funds to obtain an ongoing steady income stream.

      10.     SEC rules promulgated under Section 14(a) of the Securities Exchange Act require persons or entities to make certain disclosures.  Under those rules, the Saba Proxy Statement expressly informed GIM's shareholders that the Saba Defendants "beneficially own in the aggregate approximately 28.89% of the outstanding Common Shares" of GIM and that no Saba Defendant "is, or within the past year was, a party to any contract, arrangements or understandings with any person with respect to any securities of [GIM], including, but not limited to . . . the giving or withholding of proxies."[2]  The Saba Proxy Statement also stated that, as to itself, "[p]roxies may be solicited by mail, facsimile, telephone, Internet, in person and by advertisements."

      11.     Unbeknownst to GIM shareholders (other than Saba and the select shareholders from whom Saba offered to purchase shares), Saba's Chief Investment Officer,

---

[1]    *See* ¶¶ 41-44, *infra.*

[2]    *See* 17 C.F.R. § 240.14a-101, Item 5(b)(1) (requiring disclosure of "any substantial interest, direct or indirect, by security holdings or otherwise, of each participant" and requiring the proxy statement to "[s]tate whether or not the participant is, or was within the past year, a party to any contract, arrangements or understandings with any person with respect to any securities of the registrant, including, but not limited to  . . . the giving or withholding of proxies").

Defendant Weinstein, reached out to at least one GIM shareholder who owned large blocks of GIM shares and offered to purchase those shares at premium price—with an even higher premium if Saba's trustee nominees were elected in the shareholder vote—over the weekend leading up to the Monday, June 6, 2022 shareholder meeting.  Indeed, over the weekend before the annual meeting, Saba reached a deal to purchase at least 2,622,816 shares of GIM from third parties, increasing Saba's ownership share of GIM by more than 2.5% and bringing its total ownership stake to more than 31%.  Saba agreed to pay 99.56% of GIM's net asset value ("NAV")[3] for those shares if Saba's nominees won the trustee election.  In contrast, Saba was only willing to pay 95% of GIM's NAV if Saba's nominees lost the election, effectively incentivizing shareholders who agreed to sell to Saba to vote in favor of Saba's slate of nominees. Given that as of Friday, June 3, 2022, the Fund was trading at 90.4% of NAV, Saba's exclusive agreement to pay 99.56% of NAV to select shareholders represented a remarkable premium to the then-existing market price.[4]

12.     Saba's undisclosed strategy of secretly paying a rich premium in order to have its nominees voted in as trustees worked.  At least one large shareholder who had already submitted proxies in favor of GIM's nominees switched its votes in the last weekend before, and on the morning of, the election.  In the end, a preliminary tally of all the votes indicated that each of Saba's nominees won the election by receiving slightly more than 50% of the votes cast. Notably, approximately 90% of the shares—other than those owned by Saba or those that it

---

[3]     A fund's NAV is calculated by subtracting the fund's expenses from its daily asset value and dividing by the number of shares outstanding.

[4]     Because closed-end funds are traded among investors on the open market, their daily price depends upon, among other things, the amounts that willing buyers and sellers are prepared to transact.  Accordingly, it is common for closed-end funds to trade at either a premium (*i.e.*, above) or a discount (*i.e.*, below) to the fund's NAV.

secretly agreed to purchase in the days immediately prior to the shareholder meeting—voted in favor of the GIM nominees.

13.     At no point prior to the shareholder meeting did Saba correct its proxy material—which expressly said no such arrangements existed—to disclose to GIM shareholders that Saba had secretly offered to pay certain shareholders a premium for shares that would effectively deliver Saba a win or that Saba had therefore increased its beneficial ownership of GIM shares.  In fact, although three Saba representatives attended the annual shareholder meeting in person—including Saba's Chief Compliance Officer/General Counsel—none of them disclosed Saba's secret deal and none of them sought to adjourn the meeting to allow Saba time to correct its proxy material.  Saba waited until June 7, 2022—the day *after* the shareholder vote—to disclose its recent share purchase agreements on an amended Schedule 13D/A (attached hereto as Exhibit C).[5]

14.     To be certain, Saba's failure to disclose its last-minute arrangement to increase its ownership percentage and influence the vote is no minor violation:  this information would have altered the total mix of information shareholders had before casting their vote because, among other things, shareholders were unaware of the secret, premium deals being arranged with only certain shareholders in order to deliver to Saba control of a majority of the Board.

15.     If the preliminary results of the June 6, 2022 GIM shareholder vote tainted by the Saba Defendants' misconduct are certified, Saba's nominees stand to join the GIM Board

---

[5]     A Schedule 13D is an SEC form required when a shareholder or group of shareholders acquires 5% or more of an issuer's securities if it intends to influence the management or policies of the issuer; the shareholder must disclose its ownership percentage and "promptly" file an amendment if necessary.  17 C.F.R. § 240.13d-2.

and deliver Saba effective control of the Fund, leading to significant and irreparable harm to GIM and its shareholders whose votes were solicited and/or cast on the basis of false and misleading proxy disclosures by Saba. A new vote should be held after GIM shareholders have the benefit of true and complete information about Saba's conduct and an opportunity to cast informed votes.

## THE PARTIES

16.     Plaintiff Charles B. Johnson is a Trustee of the Johnson Family Trust, which is the owner of at least 125,000 GIM shares and was a beneficial owner of record as of the April 1, 2022 record date for the shareholder vote. Mr. Johnson voted those shares during the June 6, 2022 shareholder meeting. Mr. Johnson is the former Chairman and CEO of Franklin Resources, Inc.

17.     Plaintiff GIM is a closed-end registered investment company under the Investment Company Act of 1940, 15 U.S.C. §§ 80a-1, *et seq*. GIM trades on the New York Stock Exchange under the ticker symbol GIM.

18.     Defendant Saba Capital Management, L.P. is a limited partnership organized under the laws of Delaware with its principal place of business located at 405 Lexington Avenue, New York, New York.

19.     Defendant Saba Capital Management GP, LLC is a limited liability company organized under the laws of Delaware with its principal place of business located at 405 Lexington Avenue, 58th Floor, New York, New York.

20.     Defendant Saba Capital Master Fund, Ltd is a hedge fund operated by Saba Capital Management, L.P. and organized under the laws of the Cayman Islands with its principal place of business located at 405 Lexington Avenue, 58th Floor, New York, New York.

21.     Defendant Boaz R. Weinstein is a citizen of New York and the founder and Chief Investment Officer of Saba Capital Management, L.P.

22.     Defendant Karen Caldwell is a citizen of Illinois and is one of Saba's nominees to the Fund's Board.  She has served on the board of trustees of Saba Capital Income & Opportunities Fund since 2020.

23.     Defendant Ketu Desai is a citizen of New Jersey and is one of Saba's nominees to the Fund's Board.

24.     Defendant Mark Hammitt is a citizen of New Jersey and is one of Saba's nominees to the Fund's Board.

25.     Defendant Anatoly Nakum is a citizen of New York and is one of Saba's nominees to the Fund's Board.

26.     Nominal Defendant First Coast Results, Inc. (the "Inspector") is an inspector of election service in the proxy services industry organized under the laws of Delaware with its principal place of business located at 200 Business Park Circle, Suite 112, St. Augustine, Florida.

## JURISDICTION AND VENUE

27.     The Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act because the claims herein arise under Section 14(a) of the Exchange Act and Rule 14a-9 under the Exchange Act, 17 C.F.R. § 240.14a-9.

28.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391 because a substantial part of the events giving rise to these claims occurred in this District.  Venue is also proper because GIM is traded on the New York Stock Exchange.

29.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and justice.

**FACTUAL BACKGROUND**

A.     **The Parties**

1.     **GIM Is A Closed-End Fund That Provides A Valuable Investment Option To Shareholders**

30.     Launched in 1988, GIM is a closed-end, registered investment company under the Investment Company Act of 1940.  While they have some features in common with the more prevalent "open-end" investment companies (*i.e.*, mutual funds), closed-end funds like GIM have distinct features that structurally increase their ability to generate higher and more consistent dividends for shareholders (and potentially to generate higher returns).

31.     Among other things, closed-end funds issue a fixed number of shares. Because the number of shares in a closed-end fund is fixed, and investors generally purchase and sell shares on a securities exchange, closed-end fund shares are traded at a prevailing market price dependent upon market forces and commonly trade at a premium or discount to NAV (*see* n.4, *supra*).[6]  A fund's premium/discount rate will fluctuate over time potentially based on, among other things, market-wide/macroeconomic forces, the cost of leverage, and market

---

[6]     In contrast, the number of shares in an open-end mutual fund is not fixed, but typically varies on a daily basis.  Investors in open-end mutual funds purchase and sell shares by transacting directly with the fund, which is required to redeem (*i.e.*, buy back) shares at the option of the shareholders; these transactions occur at the fund's daily NAV.

supply/demand for the shares.  Market perceptions and investor sentiment also play a role in a fund's premium/discount rate.

32.     Because it does not create and redeem new shares on a daily basis like its open-end counterparts, a closed-end fund also has an essentially fixed asset base and does not need to (and indeed, is not required to under pertinent law) maintain a strategically less-than-desirable cash position to protect against the risk of sudden simultaneous redemptions out of the fund (also known as "fund runs").  Likewise, a closed-end fund is not typically at risk of needing to quickly liquidate positions (at potentially unfavorable prices) to meet high or unexpected shareholder redemptions.  And as a result of their relatively lower cash needs, closed-end funds are able to invest more of their assets in less liquid, or even illiquid, securities than open-end mutual funds; such securities generally provide high-income yields that can then be distributed as regular dividends to shareholders.  Additionally, because closed-end funds typically have fewer legal or self-imposed investment restrictions than open-end mutual funds, they may have access to a broader range of investment opportunities than open-end funds, including the ability to borrow money to invest and enhance returns.

33.     The features of closed-end funds make them particularly attractive to individual, retail investors and others seeking reliable income.  More so than open-end mutual funds, closed-end funds typically carry policies to provide regular distributions to shareholders, largely made up of interest and dividend payments that the fund earns on its portfolio securities. In 2021, for example, closed-end funds distributed an estimated $16.4 billion to shareholders. (*2022 Investment Committee Factbook*, Investment Committee Institute, 91 (2022) (hereinafter, "Factbook").)  The steady income stream makes closed-end funds particularly attractive to—and popular with—retirees and senior citizens.  According to the Investment Company Institute,

nearly two million retired households—about 48% of total investors—invest in closed-end funds, and many "us[e] income from these funds to help finance their day-to-day lives."  Kenneth Fang, *Closed-End Funds At a Crossroads*, Investment Company Institute (Aug. 11, 2021), https://www.ici.org/viewpoints/21-view-cef.  The average age of the heads-of-households owning closed-end funds is higher than the U.S. population as a whole, households owning mutual funds, or households owning individual stocks; similarly, a higher percentage of U.S. retirees own closed-end funds than own mutual funds or individual stocks.  (Factbook at 97.)

34.     Like many closed-end funds, GIM's primary investment objective is to seek "high, current income," which is accompanied by a policy "to provide high current income by paying monthly distributions to shareholders" at an annual minimum fixed rate of 7.5%, which was recently raised to 8%.  (GIM, Annual Report (Form N-CSR), at 37 (Feb. 28, 2022).)  Pursuant to that policy, in 2021, GIM distributed nearly $49 million to shareholders.  (*Id.* at 20.)

35.     Also consistent with other closed-end funds, GIM has a significant number of retail investors.  In fact, at present GIM's retail investor base is particularly significant: in December 2021, GIM conducted a tender offer for a percentage of its issued and outstanding common shares (*i.e.*, the Fund offered to repurchase shares from shareholders, offering 99% of NAV).  Although the tender offer was undersubscribed, of the 31 million shares tendered, the majority were owned by non-Saba institutional investors, meaning that retail investors chose to stay in the Fund.

36.     Franklin acts as GIM's manager, and in that capacity, manages the Fund's investment portfolios and oversees the Fund's day-to-day operations pursuant to an investment management agreement with the Fund.  Under Franklin's management, GIM has frequently outperformed its relevant indices.  In particular, as of May 2022, GIM had outperformed its

benchmark index, the JPM Global Government Bond Index, on both an absolute and risk-adjusted basis over the majority of standardized rolling periods over the past 20 years.

> ### 2.    The Saba Defendants Target Closed-End
> ### Funds For Liquidity Events And Takeovers For Saba's Own Benefit

37.    Historically, the Saba Defendants are investors that exploit potential arbitrage opportunities in closed-end funds for Saba's own benefit at the expense of other shareholders.  Under this "arbitrage" strategy, Saba purchases a significant minority stake—many times in excess of 20%—in a closed-end fund that is trading at a discount.  Saba then uses its resulting voting power to force events that allow it to exit the fund relatively quickly and at a profit.  Typically, Saba is able to force such "liquidity events," including the complete liquidation of the fund, conversion of the fund into an open-end mutual fund, or merging the fund with an open-end mutual fund, by wielding its voting power to seize control of the fund's board or to otherwise use its size to influence the fund's management, policies, or operations.

38.    This strategy—and its aftereffects—is contrary to the interests of retail shareholders.  In particular, Saba's aim to reap a quick profit is fundamentally opposed to that of retail shareholders, who invest in closed-end funds to obtain an ongoing steady income stream over the long-term.  Likewise, the negative consequences of Saba's arbitrage strategy undercut this aim:  in instances where Saba forces a merger or converts the fund into an open-end fund, shareholders bear the burden of the transaction costs to do so, and where Saba forces liquidation of the fund, ordinary shareholders lose entirely their chosen investment vehicle and may incur tax liabilities as a result of any capital gains on their investments.[7]

---

[7]    Saba's forced liquidity events may also have negative effects on the funds themselves. For example, liquidation requires management to sell off the fund's portfolio.  The sell-off of assets must occur within the timeframe set for the liquidation; as a result, portfolio managers cannot strategically time sales to achieve maximum prices.  Instead, portfolio managers are

39.     An example is illustrative.  By October 2019, Saba had amassed more than 21% of the shares of the Eaton Vance Floating-Rate Income Plus Fund ("EFF"), a closed-end fund managed by Eaton Vance.  In April 2020, Saba successfully exerted its concentrated voting power to nominate and elect three individuals to the EFF board.  Later, Saba used its voting power to block certain proposals, which directly caused the demise of the fund.  Specifically, in October 2020, Morgan Stanley purchased Eaton Vance's parent company.  Under the Investment Company Act, the acquisition required EFF shareholders to approve a new investment advisory agreement.  Saba opposed the new agreement and encouraged other fund shareholders to authorize Saba to vote shares on their behalf against the agreement.

40.     With its concentrated voting power, Saba successfully blocked approval of the new agreement.  Given the unsuccessful vote on the new advisory agreement, and faced with the untenable prospect of leaving the fund without an investment adviser, the fund's board considered its options and ultimately was forced to approve a plan for EFF's liquidation—as advocated for by Saba—on March 11, 2021.  EFF was thereafter liquidated and deregistered.  As a result of Saba's actions, contrary to providing long-term investors with its stated objective of capital growth with a "focus on income" with "monthly distributions," EFF ceased to exist and its retail shareholders lost this investment option and the steady income stream that came with it.

41.     More recently, Saba has added another self-interested tactic antithetical to the interests of retail shareholders in closed-end funds to its roster of investment strategies: seizing control of a closed-end fund and fundamentally altering it such that it may be

_____

forced to sell assets at what may be inopportune times in market cycles; additionally, depending on the time allotted, the market may command much lower prices if it knows the fund must liquidate quickly and has little or no leverage to negotiate.  Additionally, because closed-end funds are able to invest in relatively less liquid, or illiquid, investments that are intended to be long-term assets, there is no set market for trading.  The funds are thus forced to sell assets with little to no negotiating leverage.

unrecognizable to its other investors.  For example, the Voya Prime Rate Trust (originally traded under the ticker symbol "PPR" and managed by Voya Investment Management) was a closed-end fund launched in 1988.  As of June 30, 2020, the fund's investment mandate was to provide a "high . . . level of current income [while also ensuring] the preservation of capital."  To meet its mandate, the fund "invest[ed] . . . at least 80% of its net assets . . . in U.S. dollar-denominated floating rate secured senior loans," which make regular coupon payments to the fund that are in turn distributed to investors.

42.     In April 2020, Saba nominated eight individuals to the PPR board; with the advantage of Saba's concentrated voting power exceeding 20%, those nominees were elected at Voya's July 2020 annual shareholder meeting.  On March 25, 2021, PPR's board—now comprised entirely of Saba's nominees (some of whom are Saba employees)—chose Saba to replace Voya Investment Management as investment manager to the fund.

43.     The new board also fundamentally changed the fund's investment objectives.  After these changes, the fund—renamed to the Saba Capital Income & Opportunities Fund, trading under the ticker symbol "BRW" (perhaps not coincidentally, the initials of Saba's founder and CEO, Defendant Weinstein)—deviated drastically from its original mandate.  Under its management, Saba has remade BRW in its own image, employing investment strategies that it uses with its proprietary hedge funds—a fundamentally different product with a fundamentally different risk profile than a closed-end fund.  The objective of the now-Saba-controlled fund is "to invest in [h]igh [y]ield credit on a non-diversified basis [and] . . . opportunistically invest in other products, such as, closed-end funds and special purpose acquisition companies" ("SPACs,"

which are also referred to as "blank check companies").[8]  SPACs entail a different risk profile

than that intended by the PPR closed-end fund investors and the original mandate in which they

invested.  The fund's retail investors thus went from owning shares in a reliable, risk-averse,

income-producing fund, to a high-risk product misaligned with their needs and investment

objectives.  SPAC investments currently comprise more than 81% of the now-Saba-controlled

fund's portfolio, a stark difference from the fund's original mandate to invest more than 80% in

senior secured bank loans.

        44.     The unpredictable nature of these SPAC investments is illustrated by the

experience of one of BRW's SPAC investments.  BRW, managed by Saba, invested in the SPAC

Digital World Acquisition Corp. ("DWAC") in or around September 2021.  DWAC's prospectus

dated August 31, 2021 told investors that it had not selected any particular company for a

transaction, but noted that it intended to focus on "middle-market emerging growth technology-

focused companies."  The Saba Defendants, BRW, and BRW's investors were thus largely

unaware of what the investment in DWAC would actually entail.  In October 2021, DWAC

announced that it intended to merge with Trump Media & Technology Group.  Saba's CEO,

Defendant Weinstein, based on political views, immediately caused Saba to sell all unrestricted

shares in DWAC held by Saba's hedge funds and the funds it manages.  By virtue of Saba's

takeover, investors went from overwhelmingly holding senior secured loans, to holding blank

check SPAC investments like DWAC, to being invested in a politically polarizing new social

media company that Saba (the fund's new manager) apparently never saw coming, to being

---

[8]     SPACs are companies with no commercial operations that raise money through an initial public offering with the intent to later merge with or acquire a company with commercial operations, thereby taking the latter public.  Many SPACs do not identify upon their formation and fundraising what company or companies they intend to acquire or merge with; investors in SPACs accordingly often do not know what they may end up owning.

abruptly substantially divested from that company based on Saba's founder's political views. Putting aside any opinions regarding the merits of these wild vacillations, they are a far cry from the stable, secure, income-producing structure pursued by the legacy Voya fund and the shareholders who invested in it for their retirement and other investment needs.

**B.    The June 6, 2022 Annual GIM Shareholder Meeting**

**1.    GIM Schedules The Annual Shareholder Meeting For June 6, 2022 And Disseminates Proxy Materials Seeking Reelection Of Directors**

45.    On April 13, 2022, GIM disseminated the GIM Proxy Statement, informing GIM's shareholders that the annual GIM shareholder meeting would take place on June 6, 2022.

46.    The GIM Proxy Statement encouraged shareholders to re-elect four of GIM's trustees to serve for three-year terms set to expire at the 2025 annual meeting of the shareholders:  Mary C. Choksi, Larry D. Thompson, Rupert H. Johnson, Jr., and Gregory E. Johnson.

47.    As the GIM Proxy Statement explained, each of the nominated trustees "has experience serving as a Trustee of [GIM] and is also on the boards of other open-end and closed-end funds in the Franklin Templeton/Legg Mason fund complex.  Accordingly, these nominees have significant experience managing investment vehicles, including [GIM].  Each of [GIM]'s nominees also has substantial corporate and/or government professional experience that makes it appropriate for him or her to serve on the Board of Trustees of [GIM]."  (Ex. A at 3.)

**2.    Saba Disseminates Competing Proxy Materials Seeking To Elect Its Slate Of Trustees And To Terminate GIM's Investment Management Agreement**

48.    On April 14, 2022, Saba and the Saba Nominee Defendants disseminated a competing proxy statement to the shareholders of GIM.  The Saba Proxy Statement encouraged shareholders to elect Saba's slate of four trustee nominees to serve on the GIM Board until

17

GIM's 2025 annual meeting of the shareholders:  Defendants Karen Caldwell, Ketu Desai, Mark Hammitt and Anatoly Nakum.  Prior to the June 6, 2022 shareholder vote, four of the Board's eleven trustees had been nominated by Saba and successfully elected; these four trustees, whose terms have several years remaining, are comprised of three Saba employees and one hand-picked nominee.

49.   The Saba Proxy Statement provided no information to GIM shareholders about Saba's plans for the Fund if its nominees were successfully elected and the Board became controlled by Saba employees and its hand-selected nominees.  Saba merely informed shareholders that it "may at such time offer its services to the Board to act as an interim or long-term manager to [GIM] and/or recommend to the Board various third-party manager candidates for the Board to consider at its discretion."  (Ex. B. at 6.)  The Saba Proxy Statement also encouraged shareholders to support Saba's proposal to "terminate the Investment Management Agreement between [GIM] and" Franklin, as well as "all ot]her advisory and management agreements between [GIM] and" Franklin.  (*Id.* at 2.)

50.   The information Saba did provide, however, was either false and misleading when made or by the time of the June 6, 2022 shareholder vote.  SEC rules require parties soliciting proxies to make a number of affirmative disclosures to shareholders.  Among other things:

(a)   the SEC requires the disclosure of  "any substantial interest, direct or indirect, by security holdings or otherwise, of each participant."  17 C.F.R. § 240.14a-101, Item 5(b)(1).  The Saba Proxy Statement disclosed that the Saba Entities were "significant shareholders" of

GIM and "beneficially own in the aggregate approximately 28.89% of the outstanding Common Shares" of GIM;

(b)     the SEC requires the proxy statement to "[s]tate whether or not the participant is, or was within the past year, a party to any contract, arrangements or understandings with any person with respect to any securities of the registrant, including, but not limited to . . . the giving or withholding of proxies." 17 C.F.R. § 240.14a-101, Item 5(b)(1)(viii). The Saba Proxy Statement unambiguously stated that "no [Saba Entity] in this solicitation is, or within the past year was, a party to any contract, arrangements or understandings with any person with respect to any securities of [GIM], including, but not limited to . . . the giving or withholding of proxies;"

(c)     the SEC requires the proxy statement to "[s]tate whether or not the participant or any associates of the participant have any arrangement or understanding with any person . . . with respect to any future transactions to which the registrant or any of its affiliates will or may be a party." 17 C.F.R. § 240.14a-101, Item 5(b)(1)(xii). The Saba Proxy Statement stated that "no [Saba Entity] in this solicitation or any of hers, his or its associates has any arrangement or understanding with any person . . . with respect to any future transactions to which [GIM] or any of its affiliates will or may be a party;" and

(d)     SEC rules require that the proxy statement, in circumstances

applicable here, "state by whom the solicitation is made and

describe the methods employed and to be employed to solicit

security holders."  17 C.F.R. § 14a-101, Item 4(b)(1).  The Saba

Proxy Statement states that "[p]roxies may be solicited by mail,

facsimile, telephone, Internet, in person and by advertisements."

51.     SEC rules and associated case law impose an ongoing obligation upon

those soliciting proxies to promptly correct proxy material that may become false or misleading

as a result of later events.  17 C.F.R. § 240.14a-9.  As described below, by the time of the annual

shareholder vote on June 6, 2022, the foregoing statements in the Saba Proxy Statements were

materially misleading.  (*See* ¶¶ 53-59, 66-73, *infra*.)

### 3.     Leading Independent Proxy Advisors Recommend That GIM Shareholders Vote For GIM's Nominees

52.     On May 31, 2022, GIM announced to shareholders that three leading

*independent* proxy advisory firms—Institutional Shareholder Services Inc. ("ISS"), Glass, Lewis

& Co. ("Glass Lewis"), and Egan-Jones Proxy Services—all recommended that GIM

shareholders should vote to re-elect all four of GIM's trustees to the Board and should vote

against Saba's shareholder proposal to terminate the Fund's investment management agreement.

In its recommendation, for example, ISS observed that "GIM is built defensively, and has

historically fared better than peers in drawdowns.  This is corroborated by performance year-to-

date, which has seen GIM fare better than peers by over 9 percentage points."  Glass Lewis

observed that it "d[id] not see meaningful cause for investors to endorse further change at this

time."

**4.**      **Unbeknownst To Most GIM Shareholders, Saba
Secretly Agrees To Purchase Additional Shares At
Premium Prices In The Days Leading Up To The Annual
Meeting And Does Not Correct Its Proxy Statement Accordingly**

53.      As of Friday, June 3, 2022, it became clear to Saba and GIM that Saba's slate of nominees appeared poised to lose the GIM shareholder vote.

54.      Saba's secret actions before the June 6, 2022 shareholder meeting, however, altered the apparent course of the election.  On information and belief, Saba representatives reached out to at least one GIM shareholder during the weekend leading up to the June 6, 2022 shareholder meeting and offered to purchase shares of GIM at elevated prices if Saba's nominees won the election.

55.      In particular, GIM has learned that Defendant Weinstein and Mr. Phil Goldstein, a Principal at Bulldog Investors LLC ("Bulldog"), spoke by phone on Saturday, June 4, 2022, following a text message from Defendant Weinstein to Mr. Goldstein on Friday, June 3, 2022.  Bulldog and two affiliated funds, the High Income Securities Fund and the Special Opportunities Fund, collectively owned approximately 1.65 million shares of GIM as of April 1, 2022, the record date associated with the June 6, 2022 meeting.  As it was later relayed to GIM by Mr. Goldstein, he and Defendant Weinstein agreed that Saba would buy all of the GIM shares controlled by Bulldog at above-market prices.  In particular, as GIM later learned (*see* ¶ 63, *infra*), Saba agreed to purchase GIM shares at 99.56% of GIM's NAV if Saba's nominees won the trustee election, but at 95% of NAV—still a premium to market price—if Saba's nominees lost the trustee election.

56.      Saba's undisclosed strategy of paying a richer premium price to incentivize shareholders to vote for its slate of nominees worked.  Although the funds managed by Mr. Goldstein's firm had voted in support of GIM's trustee nominees on or before June 3,

2022, those funds subsequently changed their votes to favor Saba's nominees.  In aggregate, over

the weekend between Friday, June 3, 2022 and the morning of Monday, June 6, 2022,

approximately 600,000 shares that had already voted in favor of GIM's nominees changed their

votes in favor of Saba's nominees.  On Monday, June 6, 2022—the day of the election—

additional votes were switched from GIM's nominees to Saba's nominees in sufficient quantities

for Saba's nominees to prevail in the preliminary results.

### 5.      Saba Failed To Disclose Its Secret Deal Prior To The Shareholder Vote

57.      At no point prior to the shareholder meeting did Saba correct the Saba

Proxy Statement to disclose to GIM's shareholders that Saba had (a) increased its ownership

percentage of GIM from 28.89% to at least 31.44%, (b) offered to pay certain shareholders an

above-market purchase price for their GIM shares that was contingent upon the results of the

trustee election, or (c) would engage in "vote buying" as a means of soliciting votes.  Saba

likewise did not file an amended Scheduled 13D/A with the SEC prior to the shareholder

meeting disclosing the increase in its ownership of GIM shares.  And to the extent that any of

Saba's communications with Bulldog (or any other investor it solicited) over the weekend prior

to the shareholder meeting touching upon the upcoming shareholder vote were in writing, Saba

failed to file and disclose those communications as proxy solicitations as required by Rule 14a-6.

58.      On June 6, 2022, GIM's shareholder meeting was held as planned, in

person.  Three Saba representatives attended the GIM annual shareholders' meeting, including

Saba's Chief Compliance Officer/General Counsel Michael D'Angelo and one of Saba's outside

counsel.  At no point before or during the shareholder meeting did any of the three Saba

representatives who were physically present at the meeting (a) disclose that Saba had increased

its ownership percentage of GIM, (b) disclose that Saba had offered to pay certain shareholders

an above-market purchase price for their GIM shares that was contingent upon the results of the

trustee election, or (c) seek to adjourn the shareholder meeting to allow Saba time to correct its proxy material.

59.     Altogether, *at no point prior to or during the shareholder meeting* did Saba disclose to GIM's shareholders *in any way* that since dissemination of the Saba Proxy Statement, Saba had (a) increased its ownership percentage of GIM, (b) offered to pay certain shareholders an above-market purchase price for their GIM shares the amount of which was contingent upon the results of the trustee election, or (c) intended to engage in "vote buying" as a means of soliciting proxies.

**6.     Following Saba's Unlawful Conduct, Saba's Nominees Preliminarily Obtained More Votes At the Shareholder Meeting Than GIM's Nominees**

60.     A preliminary tally of all of the proxies voted in the June 6, 2022 GIM Board elections indicates that each of Saba's nominees received just over 50% of the votes cast. Notably, approximately 90% of the shares other than those owned by Saba or those that it secretly agreed to purchase on the weekend prior to the shareholder meeting voted in favor of the GIM nominees.

61.     Not knowing of Saba's increased ownership percentage, Saba's new, undisclosed transactions in GIM shares, or its strategy of engaging in "vote buying," owners of approximately 31% of GIM shares did not vote in the election.

**7.     After The Shareholder Meeting, Saba Belatedly Discloses Its Agreement To Acquire GIM Shares At A Premium, With An Even Higher Premium If Saba's Nominees Won The Trustee Election**

62.     As described above, although Saba agreed to purchase GIM shares at a higher premium if those shares were voted in its favor prior to the shareholder meeting, Saba did not disclose those agreements or its strategy prior to the annual shareholder meeting.

63.    On June 7, 2022—one day *after* the GIM annual shareholder meeting—Saba filed an updated Schedule 13D/A with the SEC.  A Schedule 13D/A is a relatively simple document, and nothing prevented Saba from filing an accurate Schedule 13D/A reflecting its weekend purchases prior to the June 6, 2022 shareholder meeting, rather than after it.  In fact, Saba acknowledged that the "date of event which requires filing of this statement" was June 4, 2022, the Schedule 13D/A itself is dated June 6, 2022 and was signed by Mr. D'Angelo, who was present at the meeting.

64.    Nonetheless, Saba waited until June 7, 2022 to divulge that it had "agreed to purchase an aggregate of 2,622,816 Common Shares from third parties," increasing its ownership share of GIM from the 28.89% disclosed in the Saba Proxy Statement to 31.44%. Saba also revealed that the purchase price of the shares was contingent upon the results of the election: "99.56% of [GIM]'s NAV if Saba's nominees win the trustee election or [ ] 95% of NAV if Saba's nominees lose the trustee election."  At the close of trading on Friday, June 3, 2022—one business day prior to the shareholder meeting—GIM shares were trading at 90.4% of NAV.  Shareholders who agreed to sell their shares to Saba immediately before the election could receive an additional 4.6% of NAV if Saba lost the election, but an additional 9.16% of NAV if Saba won the election.  The higher premium paid in the event of Saba's success in the election is a significant incentive for shareholders who struck a deal with Saba to vote for Saba's nominees.

65.    Saba's secret plan to pay above market prices to certain shareholders was not known prior to the shareholder meeting to (a) the Fund, (b) to most GIM shareholders who voted in the election, including Plaintiff Johnson, or (c) the approximately 31% of GIM shares that did not vote in the election.

66.     The undisclosed information would have been considered important by most GIM shareholders, including both those who did and did not cast votes, because a reasonable shareholder deciding whether to vote in favor or against the competing slate of nominees, or to abstain from voting, would have wanted to know as of the date of his or her vote, (a) how many shares Saba beneficially owned that could be used to vote in favor of, or against, Saba's nominees, (b) whether Saba was a party to any contract with respect to any securities of GIM, (c) whether Saba had any arrangements or understandings with any entity with respect to future transactions related to GIM, especially arrangements to pay a premium for shares that would tip the outcome in Saba's favor, and (d) that Saba was planning to engage in selective "vote buying" from large institutional investors as a means to solicit votes.

67.     Indeed, as set forth above, SEC disclosure rules specifically require disseminators of proxy materials to disclose *precisely those details*—and update their proxy materials if new events render prior disclosures false or misleading.  *See* 17 C.F.R. § 14a-101 (requiring disclosure of "any substantial interest, direct or indirect, by security holdings or otherwise, of each participant," requiring proxy statements to "[s]tate whether or not the participant is, or was within the past year, a party to any contract, arrangements or understandings with any person with respect to any securities of the registrant, including, but not limited to  . . . the giving or withholding of proxies," and requiring proxy statements to "[s]tate whether or not the participant or any associates of the participant have any arrangement or understanding with any person . . . with respect to any future transactions to which the registrant or any of its affiliates will or may be a party"); 17 C.F.R. § 240.14a-9.  Saba's secret deal to purchase more than 2.5% of GIM's shares immediately prior to the shareholder vote rendered its previously filed proxy disclosures inaccurate and materially misleading.

68.     Had GIM shareholders known of Saba's secret plan, they may have realized that Saba's agreed-to purchase of an additional 2.5% of GIM's outstanding shares combined with the price premium, the amount of which was contingent on the results of the shareholder vote, had the potential of swinging the vote towards Saba's slate of nominees, which would give Saba employees and its hand-selected nominees control of eight of the eleven Board seats.

69.     GIM shareholders would have considered that information as significantly altering the total mix of information made available in connection with the June 6, 2022 Board election for several reasons.

70.     For example, GIM shareholders would have considered it material and wanted to know prior to casting their votes that Saba had entered into agreements with other shareholders in order to effect a change in control of the Fund—into Saba's hands.

71.     GIM shareholders would also have considered it material and wanted to know prior to casting their votes that Saba was *selectively* offering only certain shareholders a premium to purchase their shares in GIM on terms implicating the shareholder vote. Shareholders that voted for Saba, or those that did not vote, were deprived of the opportunity to advocate for a premium for themselves, or to prevent Saba from taking over the Fund and, like BRW, turning it into something unrecognizable.

72.     Additionally, had Saba disclosed, either prior to or during the shareholder meeting, that it had (a) increased its ownership percentage of GIM, (b) agreed to buy from certain shareholders their GIM shares at an above-market purchase price, with an even higher above-market price if the trustee election resulted in the election of Saba's nominees, or (c) engaged in "vote buying" to win the preliminary tally of votes, GIM would have been in the

position to protect shareholders by making sure they were fully informed prior to casting their vote.

73.     To that end, GIM would have postponed or adjourned the meeting in order to ensure that the information about Saba's clandestine share purchases was fully disclosed to GIM shareholders in advance of their voting.  Following such postponement or adjournment, in response to Saba's disclosure of new information, GIM would have solicited shareholders who had voted for Saba to change their votes and solicited shareholders who had not voted to vote in favor of GIM.

### 8.     Following The Shareholder Vote, Saba Immediately Seeks To Take Control Of The Fund

74.     Two days after the June 6, 2022 shareholder meeting, GIM trustee and Saba portfolio manager Paul Kazarian demanded that a special meeting of the GIM Board be called for Friday, June 10, 2022 at 10:00 am—a date and time *before* the certification of the preliminary vote tally was expected to be complete *and* notwithstanding that there was a pending review and challenge to the vote tabulation.  Despite open- and closed-end funds being among the most complex and highly regulated financial products in existence, Mr. Kazarian advised that he intended to propose an abrupt replacement of  the Fund's longstanding regulatory counsel and requested that they not be invited to the special meeting; Mr. Kazarian did not disclose any apparent transition plan to new counsel.  Mr. Kazarian did not disclose any additional information about the intended discussion topics for the proposed special meeting.

75.     On June 10, 2022, Saba's counsel sent a letter to the Inspector for the GIM shareholder meeting, demanding that it certify the election results by no later than 12:00 p.m. on June 12, 2022 and threatening the Inspector with legal liability if it failed to do so.

76.     On June 11, 2022, Saba continued its letter-writing, submitting a letter from its counsel to the Board, again seeking to expedite the seating of the Saba Nominee Defendants on the Board.  Saba demanded that the Board "cease" what Saba deemed "unwarranted delays" in certification of the preliminary vote tally and that the Inspector hold any challenge session to the vote tabulation essentially immediately:  "no later than" June 13, 2022.

## <u>COUNT I</u>
### (Violation Of Section 14 Of The Securities Exchange Act And 17 C.F.R. § 240.14a-9)

77.     Plaintiffs repeat and reallege each and every allegation as set forth above in this Complaint as if fully set forth herein.

78.     In violation of Section 14(a) of the Securities Exchange Act and Rule 14a-9 promulgated thereunder, Saba disseminated proxy solicitation statements that, in light of the circumstances under which they were made, were false and/or misleading with respect to material facts or omitted to state material facts necessary to make the statements not materially false or misleading.  Saba also violated its duty under Rule 14a-9 to correct statements in its earlier communications with respect to the proxy solicitation which later became false or misleading.  Saba is liable for making those statements and omissions.

79.     In particular, the Saba Proxy Statement stated that:

(a)     Saba "beneficially own[ed] in the aggregate approximately 28.89% of the outstanding Common Shares" of GIM as of the close of business on April 1, 2022;

(b)     Saba was not a party to any "contract, arrangements or understandings with any person with respect to any securities of [GIM], including, but not limited to, joint ventures, loan or option arrangements, puts or calls, guarantees against loss or guarantees

28

of profit, division of losses or profits, or the giving or withholding

of proxies;"

(c)     Saba did not have "any arrangement or understanding with any

person . . . with respect to any future transactions to which the

Fund or any of its affiliates will or may be a party;" and

(d)     Saba would solicit proxies "by mail, facsimile, telephone, Internet,

in person and by advertisements."

80.     Each of these statements was independently false and/or misleading, as

well as misleading in the context of the proxy solicitation in which it was made and Saba's other

representations to GIM shareholders.

81.     Saba was at least negligent in making these false and/or misleading

statements and omissions in the Saba Proxy Statement.

82.     Saba's false and misleading statements and omissions in the Saba Proxy

Statement were material because a reasonable shareholder would have considered the statements

and omissions important in deciding how to vote on the proposal to elect Saba's slate of four

nominees to the GIM Board.  A reasonable investor would have viewed a full and accurate

disclosure as significantly altering the "total mix" of information made available in the Saba

Proxy Statement and in other information reasonably available to the shareholder.

83.     The Saba Proxy Statement was an essential link in causing GIM's

shareholders to vote their proxies in favor of electing Saba's nominated trustees.  If that flawed

vote—based on misleading and incomplete information—is certified, GIM shareholders will

suffer irreparable harm because of the false and misleading statements and omissions in the Saba

Proxy Statement.

84.     The irreparable harm that will arise if the vote is certified and the Saba Nominee Defendants are seated on GIM's Board (which would provide Saba with majority control, given that eight of eleven Board seats would then be filled by Saba employees or its hand-selected trustees) includes injury to internal and external business relations, diminution in the level of shareholder trust, and reputational and market injury.  For example, Saba could (a) immediately move to terminate GIM's fund manager without any concrete or previously disclosed strategy for replacing it, or with an adviser, including Saba, with little or no global bond management experience, (b) immediately seek to replace the Fund's current investment strategies with more risky ones, creating a crisis for the Fund and causing significant disruption to operations, or (c) seek to liquidate the Fund, which could cause substantial shareholder losses and tax consequences for retail investors, of which comprise the majority of the Fund's investors.

85.     There is simply no adequate remedy at law or any retrospective relief that would cure the harm to GIM and its shareholders if the vote is certified.

86.     The voiding of any post-certification results is inadequate where this Court can prevent the implementation of a vote based on materially false, misleading, and incomplete proxy solicitations.

87.     By reason of the foregoing, Saba violated Section 14(a) of the Securities Exchange Act and Rule 14a-9 promulgated thereunder.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury of all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

(a)     Enjoin all further actions related to the GIM shareholder vote that was held on June 6, 2022, including but not limited to:  (i)

enjoining certification of the putative result of the shareholder vote (or, if certified before this Court may grant relief, ordering that the certification be set aside); any (ii) enjoining Defendants from taking any actions, directly or indirectly, to seat or otherwise allow to take office as trustees of GIM the putatively elected Saba Nominee Defendants;

(b)   Order Defendants Saba Capital Management, L.P., Saba Capital Management GP, LLC, Saba Capital Master Fund, Ltd., Boaz R. Weinstein, Karen Caldwell, Ketu Desai, Mark Hammitt, and Anatoly Nakum to distribute corrective disclosures to GIM's shareholders that address the misstatements and omissions in the Saba Proxy Statement;

(c)   Order that a new 2022 annual shareholder meeting shall be scheduled following the dissemination of corrective disclosures for the purposes of electing trustees to the GIM Board;

(d)   Require the Saba Defendants to pay for the costs of this new solicitation and election;

(e)   Award Plaintiffs their reasonable costs, and expenses, and attorneys' fees incurred in this action; and

(f)   Award Plaintiffs such other and further relief as may be just proper under the circumstances.

Dated:  New York, New York
        June 12, 2022

                                   /s/ Scott D. Musoff
                                  Scott D. Musoff
                                  SKADDEN, ARPS, SLATE,
                                     MEAGHER & FLOM LLP
                                  One Manhattan West
                                  New York, New York 10001
                                  (212) 735-3000
                                  scott.musoff@skadden.com

                                  Eben P. Colby
                                  (motion for *pro hac vice* forthcoming)
                                  Christopher G. Clark
                                  Marley Ann Brumme
                                  SKADDEN, ARPS, SLATE,
                                   MEAGHER & FLOM LLP
                                  500 Boylston Street
                                  Boston, Massachusetts 02116
                                  (617) 573-4800
                                  eben.colby@skadden.com
                                  christopher.clark@skadden.com
                                  marley.brumme@skadden.com

                                  *Counsel for Plaintiffs Charles B. Johnson,*
                                  *as Trustee of the Johnson Family Trust, and*
                                  *Templeton Global Income Fund*

## VERIFICATION OF LORI A. WEBER

I, Lori A. Weber, Vice President and Secretary of the Templeton Global Income Fund, declare under the penalties of perjury that I have read the foregoing Verified Complaint and that based upon matters within my personal knowledge and on information that has been assembled and provided to me, I verify that the facts set forth in Paragraphs 1-15, 17-67, and 72-87 of the foregoing Verified Complaint are true and correct, according to the best of my knowledge, information, and belief.

Executed this 12th day of June, 2022.

Lori A. Weber